IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| HANSEN-RICE, INC., | ) | Case No. CV-04-101-S-BLW |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM DECISION** |
| | ) | **AND ORDER** |
| v. | ) | |
| | ) | |
| CELOTEX CORPORATION, a | ) | |
| Delaware Corporation, and Does | ) | |
| 1 through 10, Inclusive, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## INTRODUCTION

The Court has before it various motions.  The Court heard oral argument on January 13, 2006, and took the motions under advisement.  For the reasons expressed below, the Court will (1) grant the motion to amend to add a claim for punitive damages, (2) deny Celotex's motion for summary judgment against Hansen-Rice, (3) deny Celotex's motion for summary judgment against Dow, (4) grant Dow's motion for summary judgment against Celotex, and (5) deem moot Celotex's motion to withdraw admissions.

## BACKGROUND FACTS

Plaintiff Hansen-Rice builds patented potato storage facilities using an insulation product called Thermax that it purchased from defendant Celotex. Hansen-Rice claims that the Thermax shrank after installation, compromising its insulating properties. Fearing that poor insulation could harm stored potatoes, the parties reached an agreement, according to Hansen-Rice, that Celotex would reimburse Hansen-Rice for repairs it would make to affected buildings.

In August of 2001, Celotex sold the assets of its Thermax business to Dow Chemical Company. The parties entered into an Asset Purchase Agreement (APA) to delineate the assets purchased and the liabilities assumed.

Hansen-Rice proceeded to finish its repairs, but was never reimbursed. They brought this action against Celotex on contract and warranty claims. Celotex filed a third-party complaint against Dow, seeking indemnity for any liability it owed to Hansen-Rice.

The parties have filed various motions on both the main action and the third-party complaint. The Court will consider each motion below.

## ANALYSIS

1. **Cross-Motions on Third-Party Complaint**

Celotex and Dow have filed cross-motions for summary judgment on the

**Memorandum Decision and Order – Page 2**

third-party complaint.  In these motions, both sides agree that the APA governs the issue whether Dow has a duty to indemnify Celotex for any liability it is found to owe on Hansen-Rice's claims.  Both sides also agree that no questions of fact exist, and that the Court may interpret the APA as a matter of law.

The APA categorizes liabilities as either "Excluded" or "Assumed," meaning that either they are assumed by Dow or excluded from assumption.  The term "Excluded Liabilities" is defined to include claims that "aris[e] from or [are] attributable to products of [Hansen-Rice] sold prior to the Closing Date [August 27, 2001]." The APA also contains a definition of the "Assumed Liabilities." However, to avoid any confusion, the APA states that "the Assumed Liabilities shall not include the Excluded Liabilities."

When read together, these provisions set forth a clear analytical process for determining whether a liability is assumed or excluded.  If the liability falls within the definition of Excluded Liabilities, it is excluded and the analysis is over.  It is only when the liability does not fall within the definition of Excluded Liabilities that the liability is examined under the Assumed Liability definition to determine if it was assumed therein.

In this case, it is undisputed that all of the allegedly defective Thermax products were sold to Hansen-Rice prior to August 27, 2001.  Hansen-Rice's

**Memorandum Decision and Order – Page 3**

claims are all attributable to that defective product.[1]  Thus, Hansen-Rice's claims are covered by the definition of Excluded Liabilities and were not assumed by Dow.  The Court shall therefore grant Dow's motion for summary judgment.

Dow also seeks its attorney fees from Celotex.  The APA states that Celotex agrees to "indemnify, defend and hold harmless [Dow] . . .  from and against any Loss incurred . . . based upon, arising out of or otherwise in respect of . . . (iii) any Excluded Liabilities."  This provision contains broad language.  It includes not only a promise to "indemnify" Dow – which would include reimbursement for losses Dow would suffer if sued directly by a party in the position of Hansen-Rice – but also a promise to "hold harmless" Dow for "any" loss suffered by Dow in a dispute over Excluded Liabilities.  The attorney fees Dow incurred defending itself from Celotex's third-party complaint fall precisely within the terms of this broad language.

In accordance with the findings above, the Court will grant Dow's motion for summary judgment on the third-party complaint and deny the cross-motion filed by Celotex.  The Court will grant attorney fees to Dow and direct it to file a

---

[1]  Celotex argues that Hansen-Rice's claim for breach of contract relates to the breach of a promise to pay for repairs and has nothing to do with Celotex's products.  The Court disagrees.  The term "Excluded Liabilities" is defined broadly to include any claims "arising from or attributable to" Thermax products sold prior to the Closing Date.  The breach of contract claim is directly "attributable to" defective Thermax because the contract was designed to repair the problems caused by those defects.

**Memorandum Decision and Order – Page 4**

petition for fees pursuant to the Court's Local Rules.

## 2.   **Celotex's Motion for Summary Judgment against Hansen-Rice**

Celotex seeks summary judgment against Hansen-Rice's breach of contract and warranty claims.  Hansen-Rice claims that Celotex breached express and implied warranties by providing Thermax that shrunk after installation.  Hansen-Rice also claims that Celotex breached an agreement to reimburse Hansen-Rice for repairs it made to correct the defects.

The Court will begin by analyzing Celotex's motion seeking summary judgment on the breach of contract claim, and will then proceed to examine the breach of warranty claims.

## 3.   **Breach of Contract Claim**

Celotex claims that there is no evidence that it agreed to reimburse Hansen-Rice, and that Hansen-Rice failed to follow the proper claims procedure to obtain reimbursement.  Celotex begins, however, with a serious disadvantage – its own former sales representative, Larry Van Sickle, is providing substantial testimony against it.  The Court must assume that his testimony is true in this summary judgment proceeding.

Van Sickle's testimony includes the following:  (1) Van Sickle found shrinkage in the Thermax installed by Hansen-Rice; (2) the shrinkage was beyond

**Memorandum Decision and Order – Page 5**

Celotex's specifications; (3) the shrinkage could be caused by changes Celotex made to the composition of Thermax; (4) Celotex had previous problems with Thermax shrinkage; (5) Van Sickle discussed repair options with six of his superiors at Celotex; (6) they agreed upon a recommended repair; (7) they gave Van Sickle authorization to tell Hansen-Rice that Celotex would reimburse them for repairs to defective Thermax made according to Celotex's recommendations; (8) Hansen-Rice notified Celotex of the buildings containing defective Thermax and requested that Celotex inspect for themselves; (9) Celotex failed to make those inspections; (10) Van Sickle told Hansen-Rice to proceed with the repairs and that Celotex would make reimbursement; and (11) Hansen-Rice properly completed the repairs, and complied with its duties in the claims process, but was never reimbursed by Celotex.

Celotex disputes each of these 11 points.  For example, Celotex argues that its Product Manager, Joseph Barrow, never gave Van Sickle any authority to make promises to Hansen-Rice, and that any shrinkage was due to Hansen-Rice's improper installation techniques.  However, both of these assertions are directly contradicted by Van Sickle.  He testifies that Barrow did give him that authority, *see Van Sickle Affidavit* at ¶ 9, and that Hansen-Rice "followed [Celotex's recommended installation procedures] to the T, right to the T."  *See Van Sickle*

**Memorandum Decision and Order – Page 6**

*Deposition* at pp. 224-25.

The bottom line is that questions of fact exist on whether Celotex agreed to reimburse Hansen-Rice for its repairs, whether Hansen-Rice complied with all its duties under that agreement, and whether Van Sickle had actual or apparent authority to authorize Hansen-Rice to proceed with those repairs.

Celotex argues that the agreement is not definite enough to be enforced, and that in any event, it lacks mutuality. The Court disagrees. The mutuality is provided by the benefit Celotex received from the repairs in the form of protection from lawsuits by farmers whose potato crops may have been exposed to damage due to insufficient insulation. The promise to reimburse was sufficiently definite as it included (1) a mutually-agreed upon list of buildings to be repaired, (2) a repair method involving the spray-application of urethane foam to the Thermax seams, and (3) an agreement to reimburse Hansen-Rice for its costs in making these repairs.

Hansen-Rice need not show "absolute certainty relative to every detail of a contract." *Barnes v. Huck*, 540 P.2d 1352, 1357 (Idaho 1975). There is enough specificity here to avoid summary judgment.

Celotex argues next that there is no evidence that the Thermax is defective. More specifically, Celotex argues that Idaho "recognize[s] the necessity of expert

witness testimony" to prove "whether a defect exists . . . ." *See Celotex Brief* at p. 26. Celotex argues that Hansen-Rice has failed to introduce any expert testimony establishing that the Thermax was defective and negating other causes for the shrinkage.

Hansen-Rice responds in its briefing that this is not a defect case. The Court disagrees. To prevail on its breach of contract and warranty claims, Hansen-Rice must prove that Celotex provided defective Thermax, and must also negate other causes for the defects. *Murray v. Farmers Insurance Co.,* 796 P.2d 101, 106 (Idaho 1990). A defect may be shown by circumstantial evidence "without the benefit of expert testimony." *Id.* at 106. However, expert testimony may be required when the facts are beyond the experience of most jurors. *Jensen v. Am. Suzuki Motor Corp.*, 35 P.2d 776, 780-81 (Idaho 2001).

Celotex argues that there is no evidence of a defect – no evidence of shrinkage. However, Van Sickle testified that he found shrinkage and that it exceeded Celotex's specifications. The letter dated December 13, 2000, from Celotex Product Manager Joseph Barrow admits that there "appears to be evidence of some of [sic] shrinkage existing in at least two of your [Hansen-Rice] erected

projects." *See Exhibit B to Affidavit of Van Sickle*.[2]  This testimony creates issues of fact on whether shrinkage was present.

Celotex argues that there is no evidence that it was the cause of any shrinkage.  There is circumstantial evidence, however, pointing to Celotex: (1) Celotex was experimenting with the chemical composition of Thermax it provided to Hansen-Rice; (2) These experiments would cause various problems that required changes to the chemical composition; (3) Celotex had prior problems with shrinkage of Thermax installed by others in different locations; and (4) Celotex Product Manager Ed Fuhs admitted that shrinkage "was always a nagging problem" and that Celotex had dealt with more than 50 claims of Thermax shrinkage prior to 1997.  *See Fuhs Deposition* at pp 59-61.  This evidence creates issues of fact as to whether Celotex's manufacturing process caused the shrinkage.

Celotex argues that Hansen-Rice has failed to negate other causes.  Yet Van Sickle testified that Hansen-Rice followed Celotex's recommended installation procedures, and was a very accomplished installer.  This evidence tends to negate improper installation as a cause.

In sum, there is sufficient circumstantial evidence of a defect, its cause, and

---

[2]  While Barrow did not sign this letter, Van Sickle testified that Barrow drafted it and gave Van Sickle authority to sign it.  *See Van Sickle Affidavit* at ¶ 9.  This creates issues of fact that cannot be resolved on summary judgment.

**Memorandum Decision and Order – Page 9**

the lack of other causes, to preclude summary judgment.[3]  Celotex argues, however, that no jury could make sense of this circumstantial evidence without expert testimony.  The Court disagrees.  The evidence does not appear to be so technical or difficult-to-follow that it cries out for expert interpretation.  Of course, the presentation of the evidence at trial may change things.  Celotex remains free to raise its objection to the lack of expert testimony again at trial if the presentation of Hansen-Rice's case reveals the need for expert interpretation.  But at this stage of the litigation, the Court cannot find as a matter of law that Hansen-Rice's claims should be dismissed because of the lack of expert testimony.

For all of the reasons expressed above, the Court will deny Celotex's motion for summary judgment seeking dismissal of Hansen-Rice's breach of contract claims.

## 4.    __Warranty Claims – Statute of Limitations__

Celotex also seeks summary judgment on Hansen-Rice's warranty claims. Celotex argues first that the claims are time-barred. The Court disagrees.  The alleged warranties involved here all relate to future performance, and Idaho law provides that the limitations period on such warranties does not begin to run until

---

[3]  Obviously, all of the circumstantial evidence listed above is disputed by Celotex.  The Court's characterization of this evidence grants all inferences in favor of Hansen-Rice, and thus is not intended to constitute findings of fact.

**Memorandum Decision and Order – Page 10**

the breach "is or should have been discovered."  *See* Idaho Code § 28-2-725.

Given that the Thermax was hidden from view when installed, and that the

shrinkage appears to have occurred after installation, it is unclear when the

shrinkage "should have been discovered."  The Court therefore cannot rule as a

matter of law that the warranty claims are time-barred.

### 5.  <u>Express Warranties</u>

Celotex next challenges the merits of Hansen-Rice's warranty claims,

beginning with the claims for breach of express warranties.  Hansen-Rice claims

that Celotex breached express warranties contained on each purchase order for

Thermax sent by Hansen-Rice to Celotex.  Celotex asserts that it rejected the terms

of the express warranties on the vast majority of these purchase orders.

These purchase order forms, prepared by Hansen-Rice, typically consisted of

two pages.  The first page contained blanks where Hansen-Rice would identify the

product that it was ordering.  At the bottom of the first page was a sentence stating

as follows: "This purchase order is subject to the additional terms and conditions

set forth on the reverse side hereof."

The second page (or reverse side) consisted of densely-worded boilerplate

terms favoring Hansen-Rice, including an express warranty that "Seller expressly

warrants that all . . . materials . . . will be of good quality, material, and

**Memorandum Decision and Order – Page 11**

workmanship, merchantable and free from defects."

The record contains 53 of these purchase orders that Celotex accepted by filing the orders for Thermax requested by Hansen-Rice. *See Dixon Affidavit* at Exhibit 5. These purchase orders fall into three categories.

The first category consists of 19 purchase orders, all containing an "x" where a Celotex employee crossed-out the sentence at the bottom of page one ("This purchase order is subject to the additional terms . . . ."), and hand-wrote the word "rejected" over that sentence. The second category consists of 31 purchase orders, none of which contain cross-outs or the word "rejected," but all of which contain the words "unit pricing only" or "confirmation of unit pricing" hand-written by a Celotex employee in blank spaces on the purchase orders. The third category consists of 3 purchase orders, containing no cross-outs or hand-written limitations of any kind.[4]

Celotex argues that it rejected the express warranty for all of the purchase orders in categories one and two, comprising 50 of the 53 purchase orders. Turning first to the purchase orders in category two, it is not clear what Celotex meant by using the terms "unit pricing only" or "confirmation of unit pricing."

---

[4]  While Celotex points out that 2 of those 3 purchase orders are not signed on the "Acceptance of Seller" line, Celotex apparently filled the orders, which would indicate acceptance.

**Memorandum Decision and Order – Page 12**

Celotex argues that it meant that it was accepting the purchase order only as to the unit price, and was rejecting all other terms on page two. But that intent does not leap out at the reader from these two terse and ambiguous phrases. Perhaps industry usage or custom lends support to Celotex, but Hansen-Rice disputes that, and there is no evidence of it in this record. At least for category two purchase orders, the Court cannot find as a matter of law that the express warranty was rejected.

The purchase orders in category one present much less ambiguity – Celotex clearly meant to reject all terms on page two, including the express warranty. In this "battle of the forms" situation – where Celotex's acceptance rejects a term contained in Hansen-Rice's offer – Idaho law holds that a contract is formed but "the conflicting terms cancel out." *Southern Idaho Pipe & Steel Co. v. Cal-Cut Pipe & Supply*, 567 P.2d 1246, 1254 (Idaho 1977)(interpreting Idaho Code § 28-2-207). This case law holds that conflicting terms that fall away may be replaced by reference to other sections of Idaho's Commercial Code.

In *Southern Idaho Pipe*, the seller sent a purchase order to the buyer containing a delivery date. The buyer crossed-out the delivery date, inserted its own, and returned the purchase order. Later, a dispute arose about the purchase date and litigation ensued. The Idaho Supreme Court held that the conflicting

**Memorandum Decision and Order – Page 13**

terms cancelled each other out, and the delivery date had to be supplied by reference to other provisions of Idaho's Commercial Code.  The court turned to Idaho Code § 28-2-309(1), which stated that in the absence of an agreed-upon delivery date, a "reasonable" date should be determined.  *Id*. at 1255.

In the present case, for the 19 purchase orders where page two was "rejected" by Celotex, the express warranties set forth there are of no effect.  Under *Southern Idaho Pipe*, other terms of the Commercial Code may become applicable, such as Idaho Code §§ 28-2-314, -315, the implied warranties of merchantability and of fitness for a particular purpose.  Hansen-Rice has made claims for breach of these implied warranties, and the Court finds below that they survive summary judgment.

The effect of these findings is unclear.  Obviously, the finding that Celotex rejected the express warranty in only 19 of the purchase orders leaves the majority of the express warranties intact.  The Court has no idea whether the parties can match specific purchase orders to specific buildings, or whether the repair costs were broken down and allocated to specific buildings.

Moreover, the implied warranties may slide into the place of the "rejected" express warranties for the 19 purchase orders, perhaps providing the same level of protection.  So the rejection of the express warranty may make no practical

difference.

Whatever the final result, the Court is now discussing subjects neither briefed nor argued.  These uncertainties preclude summary judgment on Celotex's claim that the express warranty claims should be dismissed because Celotex rejected them before accepting the purchase orders.

Celotex argues next that its express warranties are limited to two limited express warranties it supplied to Hansen-Rice.  The first is a 15-year warranty warranting only the R-value of the insulation.  The second is a 1-year warranty that may have expired by the time the shrinkage was discovered.  Celotex asserts that its express warranties must, as a matter of law, be limited to these two warranties.

The Court disagrees for two reasons.  First, pursuant to the discussion above, many express warranties contained in the purchase orders survived summary judgment.  Thus, the two more limited express warranties are not the only express warranties in this case.  Second, there are questions of fact over whether Hansen-Rice received the two limited express warranties.  For these reasons, the Court rejects Celotex's argument on this issue.

**6.    <u>Implied Warranties</u>**

Celotex next seeks summary judgment on the implied warranty claims. Celotex argues first that it has disclaimed all implied warranties.  However, the

disclaimer is contained in the 15-year warranty, and as discussed above, there are questions of fact whether Hansen-Rice ever received that warranty.

Celotex argues next that the implied warranty of merchantability cannot apply under the facts of this case. Celotex cites *Powers v. American Honda*, 79 P.3d 154, 157 (Idaho 2003) for its statement that "[t]he test for determining the breach of an implied warranty of merchantability 'is to examine whether the goods were unmerchantable at the time of delivery.'" *Id*. at 157 (quoting *Dickerson v. Mountain View Equip. Co.,* 710 P.2d 621, 626 (Id.Ct.App. 1985)). Celotex asserts that *Powers* and *Dickerson* compel a ruling that no implied warranty arose in this case because the shrinkage was not apparent on delivery.

The Court disagrees. Neither *Powers* nor *Dickerson* involved an alleged latent defect – that is, a defect that lies dormant in the product until it manifests itself sometime after delivery. Yet that is the claim in this case. Hansen-Rice asserts that Celotex's manufacturing process caused the Thermax to shrink after installation.

While *Powers* and *Dickerson* do not address latent defects, other Idaho authorities hold that implied warranties may arise to protect against latent defects. In *Whitehouse v. Lange*, 910 P.2d 801 (Id.Ct.App. 1996), the Idaho court affirmed a finding that an implied warranty was breached by a latent defect, not apparent on

delivery, that could not have been discovered during an examination upon delivery. *Id*. at 807.[5]

This holding is supported by Idaho Code § 28-2-316, comment 8.  That comment discusses situations in which the buyer's examination of the goods precludes implied warranties.  It states that "an examination under circumstances which do not permit chemical or other testing of the goods would not exclude defects which could be ascertained only by such testing.  Nor can latent defects be excluded by a simple examination."

If implied warranties never apply to latent defects, this commentary – which assumes implied warranties could cover latent defects – would make no sense.  For these reasons, the Court rejects Celotex's argument that implied warranties never cover latent defects.

Celotex argues next that the claim for breach of the implied warranty of fitness for a particular purpose should be dismissed because there is no evidence that Hansen-Rice relied on Celotex's expertise to select Thermax for use in its

---

[5] *Lange* was cited with approval by another court faced with facts similar to our own.  In *H Window Company v. Cascade Wood Products, Inc*., 596 N.W.2d 271 (Minn.Ct.App. 1999), the seller sold wood sashes that looked fine on delivery but warped after installation.  The court affirmed a finding that warranties were breached, including implied warranties.  In response to the seller's argument that a jury instruction should have been given that no implied warranty arises when the buyer has an opportunity to examine the goods at delivery, the court cited *Lange* and held that no such instruction need be given because "the defect was latent."  *Id*. at 277.

**Memorandum Decision and Order – Page 17**

patented potato storage system.  The Court disagrees.  Ed Fuhs, Celotex's former

Product Manager, testified that Celotex attempted to persuade Hansen-Rice that

Thermax should be used in the potato storage system.  *See Fuhs Deposition* at p. 95.

Van Sickle testified that Celotex "went as far as trying to develop some products for

[Hansen-Rice] in some of their applications."  *See Van Sickle Deposition* at pp. 74-

75.  Both Hansen and Rice testified that they relied on Celotex's expertise in

choosing Thermax.  For all these reasons, the Court finds questions of fact on this

issue.

### 7.     **Hansen-Rice's Motion to Amend to Add Punitive Damages**

Hansen-Rice seeks to amend its complaint to add a claim for punitive

damages.  To be entitled to amend, Hansen-Rice must establish "a reasonable

likelihood of proving facts at trial sufficient to support an award of punitive

damages."  *See* Idaho Code § 6-1604(2).

Punitive damages are warranted when "the defendant acted with an extremely

harmful state of mind, whether that be termed 'malice, oppression, fraud, or gross

negligence;' 'malice, oppression, wantonness;' or simply 'deliberate and willful.'"

*Cheney v. Palos Verdes Inv. Corp.,* 665 P.2d 661, 669 (Idaho 1983).  While Idaho

case law allows punitive damages in contract actions, "they are not favored in the

law and therefore should be awarded only in the most compelling circumstances;

they should be awarded cautiously and within narrow limits."  *Jones v. Panhandle Distributors, Inc.,* 792 P.2d 315 (Idaho 1990).

The case of *Cuddy Mountain Concrete, Inc. v. Citadel Constr., Inc.,* 824 P.2d 151(Idaho Ct. App. 1992), cited by both parties, is instructive.  In that case, plaintiff Cuddy Mountain brought a breach of contract claim against Citadel, claiming that it completed subcontract work for Citadel but was never paid.

In affirming an award of punitive damages, the Idaho court found the following factors important: (1) The breach, consisting of the withholding of payments for work done, was done in "an unprofessional manner . . . conceived in frustration and consummated in anger."  *Id*. at 158; (2) The breach caused financial harm to Cuddy Mountain.  *Id*. at 158-59; (3) While there "was no evidence that Citadel intended to oppress Cuddy Mountain economically, Citadel had the upper hand in terms of bargaining power because it controlled whether or not Cuddy Mountain was paid."  *Id*. at 158; and (4) Citadel altered documents to be more critical of Cuddy Mountain's work.  *Id*.

Some of the same factors are present here, assuming that Van Sickle is truthful, and granting all inferences in favor of Hansen-Rice.  Celotex's failure to reimburse Hansen-Rice may not have been based on a legitimate contractual dispute but rather on an "unprofessional" desire to stiff Hansen-Rice.  Three pieces of

**Memorandum Decision and Order – Page 19**

evidence lend some support to this view.

First, Celotex never sent any inspectors to buildings identified as containing defective Thermax by Van Sickle and Hansen-Rice before this litigation was filed. This makes it difficult for Celotex to argue that it withheld reimbursement because it believed the Thermax was not defective or improperly installed. In fact, the only Celotex representative that inspected some buildings prior to this litigation was Van Sickle and he found defects.

Second, Celotex had past problems with Thermax shrinkage in other locations. This compounds the negative inference that arises from Celotex's failure to inspect since it shows that Celotex knew that it had a problem.

Third, statements allegedly made by Celotex's Product Manager, Joseph Barrow, to Van Sickle support the inference that Celotex was just ignoring Hansen-Rice. Van Sickle testified that on August 19, 2001, about a week before Celotex was sold to Dow, he called Barrow to inquire about the status of Celotex's reimbursement to Hansen-Rice:

> Mr. Barrow agreed that Celotex needed to address this issue but that he had not done so. He also stated that Celotex was going to be sold to [Dow], and as a result he suggested we could just tell Hansen-Rice to "go get f- - - - - -." I objected to Mr. Barrow's statement, explaining that Hansen-Rice had been an outstanding customer of Celotex for many, many years and did not deserve to be treated in this fashion. Mr Barrow merely indicated that the problem would be taken care of.

*See Van Sickle Affidavit* at ¶ 18. In his deposition, Van Sickle stated that Barrow

told him, "we're selling this company, so we really don't care.  We can tell them to go f- - -  off."  *See Van Sickle Deposition* at p. 215.

Certainly a jury might conclude, as Celotex asserts, that Barrow was just letting off steam during a stressful moment as the Dow sale loomed near.  However, the statement must also be viewed along with Celotex's failure to inspect the buildings, and its knowledge of past shrinkage problems elsewhere. That evidence at least raises a reasonable inference that Celotex was not acting in good faith, on the basis of a principled contractual objection, in withholding reimbursement, but instead was stiffing Hansen-Rice while reaping the benefits of its repairs.

As in *Cuddy Mountain*, the withholding of the payments resulted in financial damage to plaintiff, and was done by the player in the stronger bargaining position. Here, Celotex had reaped the benefit of Hansen-Rice's repairs, and knew that Hansen-Rice had no leverage to obtain payment.

Like *Cuddy Mountain*, this case presents a "close question."  *Id*. at 159. Ultimately, the court in *Cuddy Mountain* found sufficient evidence that Citadel's actions were "an extreme deviation from reasonable standards of business conduct." *Id*. at 161.[6]

---

[6]  The court made this finding even though there was "no expert testimony regarding the extent of Citadel's deviation from reasonable conduct," signaling that this finding does not require expert testimony.  *Id*. at 161.  Likewise, Hansen-Rice has submitted no expert testimony on this issue here.

**Memorandum Decision and Order – Page 21**

Here, the Court need only find that Hansen-Rice has a "reasonable likelihood" of prevailing on the punitive damage issue.  If Van Sickle is believed, and all inferences granted to Hansen-Rice, one interpretation of the evidence is that Celotex stiffed Hansen-Rice, not based on a principled contractual objection, but merely as an exercise in bargaining strength since Celotex had reaped the benefit of the repairs and Hansen-Rice lacked leverage.

This conduct could not be deemed a legitimate hard-nosed business practice. It is more accurately labeled as an extreme deviation from reasonable standards of business practice.  Therefore, the Court finds that Hansen-Rice has met its "reasonable likelihood" standard, and is entitled to amend its complaint to include a claim for punitive damages.

**8.**   **Celotex's Motion to Withdraw Admissions**

Celotex seeks to withdraw admissions it was deemed to make by failing to respond to discovery requests.  Specifically, the deemed admissions admit that Dow is not liable for the Hansen-Rice claims.  The Court has not relied upon those admissions in reaching its decision here, and therefore finds the motion to be moot.

**ORDER**

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that Celotex's motion for

summary judgment against Hansen-Rice (Docket No. 54) is DENIED.

IT IS FURTHER ORDERED, that Dow's motion for summary judgment against Celotex (Docket No. 50) is GRANTED and the third-party complaint is hereby DISMISSED.

IT IS FURTHER ORDERED, that Dow is granted its attorney fees as against Celotex to be determined after Dow files its petition for fees and Celotex has responded.

IT IS FURTHER ORDERED, that Celotex's cross-motion for summary judgment against Dow (Docket No. 61) is DENIED.

IT IS FURTHER ORDERED, that Hansen-Rice's motion to amend to add punitive damages (Docket No. 49) is GRANTED.

IT IS FURTHER ORDERED, that the motion to withdraw admissions

(Docket No. 52) is DEEMED MOOT.



DATED:  **February 7, 2006**

B. LYNN WINMILL
Chief Judge
United States District Court